**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATALIE LANDAVERDE, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>*Defendant*. | Case No.: _______________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff NATALIE LANDAVERDE ("Plaintiff"), by and through her counsel, on her own behalf and on behalf of all others similarly situated, bring this Class Action Complaint (the "Complaint") against Defendant, BANK OF AMERICA, N.A. ("Bank of America," the "Bank" or "Defendant"), and alleges the following facts in support of her claims against Defendant based upon personal knowledge, where applicable, information and belief, and the investigation of her counsel, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this putative nationwide class action against Bank of America for its alleged concealment of material deficiencies in the anti-money-laundering, transaction-monitoring, and financial-crime compliance systems protecting its banking services.

2. For decades, and as the second largest bank in the United States, Bank of America marketed and provided banking services to millions of consumers and businesses, while maintaining internal compliance systems intended to detect and escalate suspicious financial activity. According to the United States Department of the Treasury ("Treasury Department"), those systems utterly failed either due to negligent and deliberate indifference or the actual willful participation in unscrupulous behavior. Specifically, and according to the Treasury Department, Bank of America failed to monitor trillions of dollars in transactions – including more than $5 billion worth of suspicious transactions, such as those tied to Chinese money-laundering networks, narcotics trafficking, and other fraud.

3. Unbeknownst to Plaintiff and members of the proposed Class, Bank of America's systems suffered from significant deficiencies that impaired the Bank's ability to identify, investigate, and report illicit transactions, thereby misleading consumers who do business with

Bank of America as well as omitting the truth about material elements concerning how the Bank does business.

4. On October 13, 2026, the Financial Crimes Enforcement Network ("FinCEN") announced a significant, $1.2 billion civil monetary penalty against Bank of America arising from failures in its anti-money-laundering compliance program. In resolving the enforcement proceeding, Bank of America admitted willful violations of the Bank Secrecy Act, including failures to maintain an adequate anti-money-laundering program, conduct required due diligence, and file Suspicious Activity Reports.

5. At bottom, federal regulators determination that Bank of America failed to timely report more than $5 billion in suspicious transactions, including activity implicating serious financial-crime and national-security risks is due to profound failures by Bank of America to follow federal and state laws. The Office of the Comptroller of the Currency ("OCC") separately determined that Bank of America's compliance program was deficient and ineffective and that significant deficiencies persisted despite prior regulatory intervention.

6. Each time that customers, like Plaintiff and Class members, transact with their respective banks, they engage in business that provides that respective bank with liquidity – such as the deposit of funds into a checking or savings account, or the purchase of a certificate of deposit. Additionally, customers pay to utilize the services of a bank – including the payment of various banking and transaction fees. Bank of America is no different. When Plaintiff and Class members, who are customers of Bank of America, fund an account with the Bank or pay fees to the Bank, they provide the Bank with liquidity (often in exchange for an interest rate). Bank of America has an obligation under federal and state law to engage in standard KYC ("know your

customer”) protocols to know from whom they are accepting business and under what specific circumstances.

7. There is no excuse for the acceptance of business, of funds, or of transactions from criminal organizations or from hostile powers seeking to launder money. According to Treasury Secretary Scott Bessent with respect to the fines levied against Bank of America for this conduct, “[e]ven the biggest financial institutions are not above the law.” Banking regulators responsible stated that Bank of America prioritized revenue over the deficiencies in its monitoring systems, which resulted in sactions compliance failures involving countries such as Russia, Iran, and other restricted jurisdictions. On October 14, 2026, and due to these material misrepresentations and omissions, Bank of America’s stock price substantially dropped (-4.76%) on the day after sanctions were announced.

8. These failures are materially important to the customers who do business with Bank of America as well. At bottom, a United States bank which calls itself “Bank of America” should not be affiliated with illegal conduct, scams, and various types of fraud-based illicit activity which harms national security interests.

9. Indeed, Plaintiff Landaverde alleges that these findings reveal material facts concerning Bank of America’s banking operations that were not adequately disclosed to customers. Customers should have been able to choose to do business (and provide liquidity) to a bank which was not engaged in such express violations of federal and state laws – but Bank of America deliberately concealed its activity so that customers were deprived of that choice. Additionally, Plaintiff further alleges, subject to identification of specific representations described below, that Defendant’s failure to disclose these deficiencies rendered its statements concerning the integrity, security, and monitoring of its banking services materially misleading. When Plaintiff Landaverde

signed her agreement to use Bank of America as her banking provider, she did not do so to help fund a corporation engaged in financing illicit and criminal activity.

10. Had Plaintiff Landaverde known the truth, as well as the many millions of other Bank of America customers in the United States, Plaintiff would not have opened or maintained the account, paid the challenged fees, or undertaken the transactions on the same terms. Plaintiff Landaverde seeks relief for economic losses proximately caused by Defendant's actionable omissions and concealment, though not for violations of the Bank Secrecy Act standing alone.

## JURISDICTION AND VENUE

11. ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) there are over 100 members of the putative class, inclusive of Plaintiff, (2) in statutory penalties and other damages, Plaintiff and Class members are reasonably seeking over $5,000,000 in relief, and (3) there is minimal diversity between the litigants – including Plaintiff Landaverde, who is domiciled in New York, and Defendant Bank of America, N.A., which is headquartered in Charlotte, North Carolina and was incorporated in the State of Delaware.

12. ***Personal Jurisdiction.*** This Court has personal jurisdiction over the litigants because Plaintiff Landaverde is domiciled in New York (specifically, in this District) and Defendant is both registered to do business in New York and conducts significant business operations in New York as well.

13. ***Venue.*** Venue is proper under 28 U.S.C. § 1391 because Plaintiff Landaverde is domiciled in New York, her transactions took place in New York, and Defendant Bank of America, N.A. directed business to this District in New York which resulted in Defendant transacting business with Plaintiff Landaverde.

## PARTIES

***Plaintiff Natalie Landaverde***

14. Plaintiff Natalie Landaverde is a citizen of the State of New York, is domiciled in Nassau County, and maintained Bank of America checking and savings accounts during the relevant period.

15. Plaintiff Natalie Landaverde would not have chosen Bank of America as her bank had she known the truth about Bank of America's funding of illicit and illegal activity – but Plaintiff Landaverde would continue doing business with Bank of America if Bank of America stopped engaging in said behavior.

***Defendant Bank of America, N.A.***

16. Defendant Bank of America, N.A. is a national banking association with its main office in Charlotte, North Carolina, and conducts substantial banking operations within the Eastern District of New York, including in Nassau County where the Plaintiff is domiciled. The Bank employs 211,000 personnel and maintains over 3,500 branches and approximately 15,000 ATM locations in the United States. According to the Bank's most recent financial disclosures, Bank of America's reported net income exceeds $30.5 billion.

17. In Nassau County, there are over 40 ATMs and branch locations which belong to Bank of America.

## FACTUAL ALLEGATIONS

***A. Bank of America's Banking Services***

18. Bank of America is the second largest consumer bank in the United States.

19. Bank of America offers deposit accounts, electronic payment services, wire transfers, and other financial products to consumers and businesses throughout the United States.

Bank of America also directs substantial advertising and marketing to potential customers around the United States to solicit their business.

20. Consumers entrust Bank of America with their funds and use its services in reliance upon the contractual terms and material representations made in connection with those services.

21. Bank of America maintains or should have maintained substantially uniform policies and centralized systems concerning transaction monitoring and financial-crime compliance. Bank of America, like every other major bank in the United States subject to regulation, is aware of its obligations to maintain adequate policies and procedures to maintain compliance with laws that adhere to transaction monitoring to avoid suspicious transactions.

22. Bank of America is also cognizant of the risks that are incumbent upon a bank pertaining to the possibility of illicit and illegal transactions; these risks are what mandate said policies and procedures, including KYC procedures whereby the Bank is monitoring who their customers are and what types of transactions they are participating in.

***B. Bank of America's Undisclosed Compliance Deficiencies***

23. According to FinCEN's October 13, 2026 Consent Order, Bank of America failed to maintain an anti-money-laundering compliance program satisfying applicable regulatory requirements during the period addressed by the Order. *See, In the Matter of Bank of America, N.A.*, Consent Order No. 2026-03 (Oct. 2026). According to the Order, Bank of America violated the Bank Secrecy Act ("BSA") and its implementing regulations. *See, e.g.,* 12 U.S.C. §§ 1829b, 1951-1960, 31 U.S.C. §§ 5311-5314, 5316-5336.

24. According to the Order, the BSA requires U.S. banks "such as Bank of America, to implement and maintain an anti-money laundering (AML) program, including policies, procedures

and controls to assure ongoing compliance with the applicable provisions of the [BSA." These responsibilities include:

1. Conducting independent testing for compliance;
2. Designating individuals responsible for coordinating and monitoring day-to-day compliance;
3. Conducting ongoing training for appropriate persons; and
4. Implementing risk-based procedures for conducting ongoing customer due diligence (CDD) including but not limited to understanding the nature and purpose of customer relationships and conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information.

25. Additionally, and also according to the Order, Bank of America has and had an obligation to "conduct due diligence on correspondent accounts for foreign financial institutions" which, in adherence with 31 U.S.C. § 5318(h), includes establishment of a "due diligence program that includes appropriate, specific, risk-based, and where necessary, enhanced policies, procedures and controls that are reasonably designed to enable the covered financial institution to detect and report, on an ongoing basis, any known or suspected money laundering activity conducting through or involving any correspondent account established, maintained, administered, or managed by such covered financial institution in the United States for a foreign financial institution."

26. Finally, Bank of America, pursuant to the Order and related statutes, "must identify suspicious transactions relevant to a possible violation of law or regulation in suspicious activity reports (SARs) filed with FinCEN. This includes the obligation to report transactions that involve

or aggregate to at least $5,000 which the Bank "knows, suspects, or has a reason to suspect" are suspicious." According to the BSA, at 31 C.F.R. § 1020.320(a)(2), a transaction is suspicious if a bank "knows, suspects, or has a reason to suspect" that the transaction:

i. Involves funds derived from illegal activities or is intended or conducted to disguise funds derived from illegal activities as part of a plan to violate or evade federal law;

ii. Involves a design to evade the reporting or recordkeeping requirements of the BSA or regulations implementing it; or

iii. Has no business or apparent lawful purpose or is not the sort in which the customer would reasonably engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

27. Regulators identified systemic deficiencies in transaction monitoring, customer due diligence, escalation procedures, and suspicious activity reporting. The deficiencies caused substantial suspicious activity to remain undetected, uninvestigated, or unreported within required timeframes. Regulators further determined that Bank of America failed to respond adequately to known compliance weaknesses.

28. To be clear -- these failures were not merely isolated employee mistakes. They reflected broader deficiencies in the Bank's compliance operations. The OCC found that significant deficiencies continued notwithstanding a December 2024 regulatory order requiring corrective action.

### *C. Bank of America's Material Omissions and Misleading Partial Disclosures*

29. During the Class Period, from January 1, 2018 through July 1, 2025, Bank of America represented to Plaintiff and Class members that the Bank "is subject to extensive laws, rules, and regulations in the U.S. and other jurisdictions where it operates regarding bribery and corruption, know-your-customer requirements, anti-money laundering, embargo programs and economic sanctions" according to Bank of America's Form 10-k filed with the Securities and Exchange Commission on February 20, 2024. *See,* Pg. 4. The Bank continues, "[f]or example, we are subject to the U.S. Bank Secrecy Act (BSA) which contains anti-money laundering and financial transparency laws designed to detect and deter money laundering and the financing of terrorism, as well as record-keeping, reporting, due diligence, and customer verification requirements, various sanctions programs administered and enforced by the [Treasury Department.]" *Id.*

30. With respect to Compliance and Operational Risk Management, the same filing, as others before it during the Class Period, states: "[w]e are subject to comprehensive regulation under federal and state laws, rules, and regulations in the U.S. and the laws of the various jurisdictions in which we operate, including those related to financial crimes and anti-money laundering, market conduct, trading activities, fair lending, privacy, data protection, and unfair deceptive or abusive acts or practices." *Id.*, at 79. The Bank states, "[our] global compliance and operational risk teams independently assess compliance and operational risk, monitor business activities and possess […] control functions for adherence to applicable laws, rules, and regulations, including identifying issues and risks, and reporting on the state of the control environment." *Id.*

31. While this representation, and representations like it, exist in numerous materials, and did during the Class Period, Bank of America deliberately failed to adhere to it – despite garnering investments through material representations like these on one hand, and soliciting business through consumer accounts through the trust it sought from Plaintiff and Class members by handing their funds on the other hand.

32. Account opening packets also do not allow Bank of America to delegate the duties it has under law to abide by the types of requirements set by the BSA and other regulations like it. For example, in the May of 2026 account opening packet written by Bank of America, it states, "[w]e are responsible for exercising ordinary care and complying with this Agreement. Any provision of this Agreement that limits our liability does not change our duty to act in good faith and with ordinary care." *Bank of America Account Opening Packet*, at Pg. 45.

33. However, Bank of America failed to disclose, in connection with that representation, that almost none of the foregoing was true. Bank of America failed to maintain an adequate AML program, it did not conduct adequate due diligence, and it failed to identify suspicious transactions.

34. According to the Order:

1. The Bank willfully failed to implement and maintain adequate internal controls for AML and BSA compliance, primarily due to critical deficiencies and gaps in its proprietary transaction monitoring system, which resulted in both missed and delayed detection reporting by the Bank of over $5 billion of suspicious activity, with roughly $1 billion of this activity implicating national security-related and other priority illicit finance risks, including

suspicious transactions indicative of Chinese money laundering networks, fraud, and potential trade-based money laundering with a substantial nexus to the southwest border.

2. The Bank, during the Class Period, lacked primary controls used to fulfill its obligation to identify and report suspicious activity. This included, but was not limited to, large volumes of suspicious activity implicating national security-related and other priority illicit finance risks, including over $600 million of transactions with trade-based money laundering involving salvaged vehicles and hundreds of millions of dollars of transactions consistent with Chinese money laundering networks.

35. To compound matters, Bank of America lacked the staff necessary to keep up with flagged transactions and Bank of America's staff were aware that certain customers were tied to high-risk activity. Indeed, other financial institutions even flagged the exact same pattern of activity of concern, but Bank of American failed to appropriately monitor or report such activity. Bank of America's independent testing program functions also failed to properly detect and describe issues as mentioned above, even though that testing program was the primary internal control to comply with the obligations to identify and report suspicious activity.

36. With respect to many transactions, the Bank failed to adequately consider customers' international business activities, geographic footprints, and exposure to high-risk jurisdictions – with elevated trade-based money laundering and sanctions evasion risks. As part of this, the Bank was deficient – it failed to adequately maintain and update customer information on a risk basis, even ignoring observations made from one quarter to another.

37. Other concerns tied to the Bank's willful failures included suspicious activity related to scam activity, with internal case notes stating that one customer engaged in "numerous cases with scam activity, romance scams, Nigerian scams, and COVID [related scams]." Yet the bank failed to adequately act.

38. Plaintiff alleges that the undisclosed information was material because it concerned a significant limitation on the financial-crime controls associated with the services Defendant was offering. Defendant possessed superior knowledge of the relevant deficiencies, which were internal to its banking operations and not reasonably ascertainable by ordinary customers.

39. Plaintiff alleges that Defendant had a duty to disclose the omitted information because its banking customers had every right to know that the funds they provided to the bank and the business that they engaged in was actually funding illicit and illegal conduct in contradiction to securities filings and various materials provided to consumers.

40. Plaintiff does not contend that every regulatory compliance deficiency must independently be disclosed to every bank customer. Rather, the alleged duty arises from Defendant's specific statements and the circumstances in which those statements were made.

***D. Reliance and Economic Injury***

41. Plaintiff reviewed or received the bank account opening packet in 2023 before opening her accounts with Bank of America. Plaintiff understood representations to mean that both parties would follow both federal and state law. Additionally, it was not disclosed to Plaintiff that she was indirectly financing illegal and illicit activity through her conducting of business with the Bank.

42. Had the omitted facts been disclosed, Plaintiff would have used a different bank other than Bank of America.

43. Plaintiff does not seek recovery based solely upon an increased risk of future financial crime, the existence of regulatory violations, or the penalties imposed by federal regulators. Rather, Plaintiff, on behalf of herself and Class members, seeks recovery based on theory that she paid fees to Bank of America which should be refunded because: (1) those fees were not disclosed as being part of a larger payment into a criminal enterprise, (2) the representations that Bank of America made to its customers were false and misleading with respect to its legality considerations and (3) those fees were not used as follows, which should have been to implement the necessary policies, procedures and controls to prevent the conduct as alleged both above and below.

## CLASS ACTION ALLEGATIONS

44. Plaintiff Landaverde brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as applicable.

45. Plaintiff Landaverde proposes the following Class and Subclass, subject to refinement following investigation and discovery:

> **Nationwide Class Definition**. All persons in the United States who, from January 1, 2018 through July 1, 2025, maintained a Bank of America deposit account and paid fees for said account.

> **New York Sub-Class Definition**. All persons in the State of New York who, from January 1, 2018 through July 1, 2025, maintained a Bank of America deposit account and paid fees for said account.

46. Excluded are Defendant, its officers and directors, the presiding judicial officers, and their immediate families.

47. The Class is sufficiently numerous that joinder is impracticable.

48. Common questions include whether Defendant knew of material compliance deficiencies; whether identified statements were misleading by omission to a reasonable customer

such as Plaintiff; whether Defendant had a duty to disclose; and whether common evidence can establish liability and damages.

49. Plaintiff's claims are typical of the Class to the extent that Plaintiff and Class members were exposed to the same challenged representations and suffered injury through the same alleged course of conduct.

50. Plaintiff will fairly and adequately protect the interests of the Class.

51. Common questions predominate to the extent that liability, materiality, and causation can be established through common proof rather than individualized customer communications and decisions.

52. A class action is superior to other available methods of adjudication because there are too many victims as alleged for joinder to be practicable and the most efficient form of adjudication is a class action.

## COUNT I

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

(Both the Nationwide and New York Sub-Class)

53. Plaintiff incorporates the preceding paragraphs.

54. Defendant possessed material nonpublic information concerning deficiencies in its transaction-monitoring and financial-crime compliance systems.

55. Defendant failed to disclose that information in circumstances where it had a legal duty to do so and duties pursuant to contract, as described above.

56. Defendant's omissions rendered the specific statements identified in above to be misleading and outside of the bounds of dealing in good faith with Bank of America's customers, like Plaintiff Landaverde and Class members.

57. Defendant knew the relevant undisclosed facts and still acted accordingly in violation of dealing in good faith with it customers.

58. Plaintiff Landaverde actually and justifiably relied on the misleading statements and omissions in making the decisions described above.

59. As a direct and proximate result, Plaintiff suffered the concrete pecuniary losses as identified herein.

60. Defendant is liable for damages caused by its breach of good faith and fair dealing pursuant to contract and common law.

**COUNT II**
**Deceptive Acts and Practices**
New York General Business Law § 349
(Both the Nationwide and New York Sub-Class)

61. Plaintiff incorporates the preceding paragraphs.

62. Defendant engaged in consumer-oriented conduct by making materially misleading representations or omissions in connection with banking services offered to the public.

63. The challenged representations and omissions were likely to mislead a reasonable consumer acting reasonably under the circumstances.

64. The conduct occurred in New York or otherwise bears the required territorial connection to New York consumer transactions.

65. Plaintiff suffered actual injury because of Defendant's materially deceptive conduct, separate from the mere existence of a regulatory violation.

66. Plaintiff seeks available statutory of $50 per violation as well as actual damages, injunctive relief where appropriate, and reasonable attorneys' fees as permitted by law.

67. Plaintiff seeks to also represent a nationwide class of customers under substantially similar statutes which redress deceptive acts and practices in each state that permits such allowable recovery.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Landaverde, individually and on behalf of all others similarly situated, respectfully request that the Court:

a) Certify this action as a class action and appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

b) Enter judgment in favor of Plaintiff and the Class;

c) Award compensatory damages in an amount established at trial;

d) Award statutory damages where authorized;

e) Award appropriate declaratory and injunctive relief upon a showing of standing and entitlement;

f) Award prejudgment and post judgment interest;

g) Award reasonable attorneys' fees and costs where permitted; and

h) Grant such other relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

**DATED:** October 15, 2026

Respectfully submitted,

*/s Blake Hunter Yagman*
Blake Hunter Yagman
**YAGMAN PLLC**
The Chrysler Building
405 Lexington Avenue, 26th Floor
New York, New York 10174
*blake.yagman@yagmanpllc.com*
Tel.: 929-709-1493

Lori G. Feldman
David L. Hecht
Kathryn Lee Boyd
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
*lfeldman@hechtpartners.com;*
*eservicecapg@hechtpartners.com*
*dhecht@hechtpartners.com*
*lboyd@hechtpartners.com*
Tel: 888.421.4529

*Attorneys for Plaintiff Landaverde and the Proposed Classes*